2010 Ark. App. 423

**Tammy KINARD, Appellant**

v.

**ARKANSAS DEPARTMENT OF HUMAN SERVICES,**
**Appellee.**

**No. CA 10–67.**

Court of Appeals of Arkansas.

May 12, 2010.

---

15. *See Rogers I, supra.*

 

Deborah Ruth Sallings, Arkansas Public Defender Commission, Little Rock, AR, for appellant.

Keith L. Chrestman, Chrestman Group, PLLC, Jonesboro, AR, Tabitha Baertels McNulty, Little Rock, AR, for appellee.

DAVID M. GLOVER, Judge.

Appellant, Tammy Kinard, appeals from an order terminating her parental rights in her daughter, J.K. Her sole argument for reversal is that the circuit judge erred in viewing her home during the termination hearing. We hold that the court's view was contrary to Arkansas law but that the error was harmless in light of the other evidence in the case. We therefore affirm the termination order.

On November 4, 2007, the Fort Smith Police Department received a report that eight-year-old J.K. was alone at a grocery store, lost and unable to cross Rogers Avenue. J.K. had a Subway sandwich and a note from appellant containing the Subway order. A police officer took J.K. home and found appellant lying on a bed and living in a foul-smelling environment. Appellant told the officer that she wanted to send J.K. to Wal–Mart at that point, but the officer advised that it was probably not safe for her to go alone. According to the Arkansas Department of Human Services ("DHS"), a representative from J.K.'s school reported that J.K. was responsible for taking care of all housework and expressed a desire to be in foster care. Four days later, DHS caseworkers went to appellant's apartment, and appellant answered the door in a nightgown that appeared to be covered with feces. The caseworkers observed that the house was in disarray, had a bad odor, and was filled with flies. They additionally discovered that appellant had not been giving J.K. her prescribed medication. When the workers advised appellant that they planned to ex-

ercise a seventy-two-hour hold on J.K., appellant stated that if J.K. did not want to come home, appellant would "sign the papers because I am a grown woman and I don't need that in my life." DHS was aware of the family's history: J.K. was in foster care for more than a year in 2004–05 due to physical abuse, inadequate housing, neglect, and "caretaker unable to cope," and another case was opened in March 2007 because J.K. was being locked in her room each night from 7:00 p.m. until time for school the next day. Based on these circumstances, DHS sought emergency custody of J.K. The circuit court granted DHS's custody petition on November 13, 2007.

Thereafter, the court found probable cause for J.K.'s removal from the home and adjudicated J.K. dependent-neglected based on lack of supervision. The court established a goal of reunification and directed appellant to maintain stable and appropriate housing and income; to complete parenting classes; to undergo a psychological evaluation and complete recommended counseling; to maintain transportation; to visit J.K. regularly; and to participate in family counseling if recommended by J.K.'s therapist.

On June 5, 2008, the court conducted a review hearing, after which it maintained the goal of reunification. The court found that appellant had partially complied with the case plan and court orders but had not completed parenting classes or undergone a psychological evaluation. The court ordered appellant to perform those tasks and to undergo an examination to determine her physical ability to care for J.K. A permanency-planning order entered five months later maintained the goal of reunification and reiterated appellant's obligations.

The court's next order, following an April 2009 hearing, changed the goal of the case to termination of parental rights. The court found that appellant had lost her means of transportation, failed to attend counseling, missed visits with J.K., and refused to allow DHS and CASA representatives to inspect her home. DHS filed a petition to terminate appellant's parental rights, and a termination hearing took place on September 28, 2009.

At the hearing, J.K.'s therapist, Kim Davis, testified that she had recommended stopping appellant's visitation with J.K. Davis described a DVD she had seen of one visit in which appellant apparently spilled nail polish on the floor, chastised J.K. about being responsible for it, made J.K. clean up the spill, critiqued her cleaning efforts, mentioned money to replace the spilled bottle, and declared that "they are going to throw us the hell out of here." Davis said that J.K. was in tears over the incident.

CASA director Glenda Evans testified that she facilitated visits between appellant and J.K. and videotaped the visits as required by court order. She presented the court with a videotape of some representative visits including the nail-polish incident, which Evans said went on for "a very long time." Another visit involved a child who was playing with J.K. and whom appellant asked, "[W]hat's wrong with you?" When the child hesitantly replied that she had cerebral palsy, appellant stated that God punishes people by giving them diseases. During another visit, J.K., who was by then ten years old, had gotten a haircut that she requested herself. When appellant saw the haircut, she criticized J.K. in a manner that Evans described as cruel and that went on so long that Evans eventually asked appellant to stop. Yet another visit found appellant upset over a small hole in J.K.'s blouse, which she photographed "to let the judge see how [J.K.] comes to these visits." According to Evans,

no supporting and loving relationship existed between appellant and J.K., and she described the relationship as strange, with J.K. acting like a three-year-old around appellant and engaging in inappropriate kissing and touching. Evans said that she had recommended in the past that visitation be suspended and that she now recommended termination of appellant's parental rights.

Evans also produced a series of photographs taken on April 15, 2009, which was the last time before the termination hearing that CASA was able to obtain access to appellant's home. Evans testified that the photographs showed that appellant's bed was very dirty with feces on it; that there were feces all over the commode; and that there were other unkempt and cluttered areas. Appellant objected that the pictures were "five or six months old," at which point DHS's attorney suggested that the court take a recess and visit appellant's home. The court did so with all counsel, appellant, and the bailiff present. Appellant voiced no objection.

Following the visit, the hearing resumed and appellant took the stand. She acknowledged that her apartment was not appropriate at the time of trial and that it was "a mess" because she was depressed and did not expect J.K. to return home immediately. Appellant also stated that her home had less food in it than it did in April and that she believed that the toilet "looked worse today than it did in April." Regarding other matters, appellant testified that she had prescriptions for several medications and was under "medication management" with her doctor. However, she said that, even though she was supposed to return to her doctor six months after her last appointment in January 2009, she had not done so. Appellant also admitted that her last counseling appointment had been on April 30, 2009. Her

therapy records indicated that she had been discharged for noncompliance on that date; that her diagnosis included "possible delusions"; that her mental-health symptoms increased in February; and that she did not attend day treatment as recommended.

Appellant's testimony also demonstrated her propensity for delusional and paranoid thinking. She stated that she told her therapist that God promised to provide her with diamonds and that she had obtained a $12,000 ring for $150. She also accused DHS family service worker Tiffany May of stealing her car and using "stalkers and creepers" to follow her and attack her in bed; claimed that her maintenance man allowed people to enter her apartment at night by selling them keys for ten dollars; and believed that police detectives, to whom she had reported her car stolen, said that the car was repossessed "to make me look bad."

DHS caseworker Brenna Meyers testified that appellant had not provided a letter from her doctor stating that she was physically and emotionally capable of parenting J.K. She also stated that appellant never progressed far enough in her individual therapy to permit family therapy to take place. Meyers said that she would describe J.K. as "brow-beaten" by appellant and stated that DHS recommended termination of parental rights.

Based on the foregoing evidence, including the court's viewing of appellant's home, the court found that termination of appellant's parental rights was in J.K.'s best interest and that grounds for termination existed. The termination order noted the condition of appellant's home but declared that the primary impediments to reunification were appellant's mental illness, which had worsened with delusions and paranoia, and appellant's lack of compliance with counseling, treatment, and medication

management. Appellant appeals from the court's order and argues that the court "erred by making a home visit to appellant's apartment to view the conditions of her home and by failing to ensure that a record was made of what occurred during that visit."

Arkansas law has long permitted a fact-finder to leave the courtroom and view a site that is material to the matter being tried. *See Fitzgerald v. La Porte*, 67 Ark. 263, 54 S.W. 342 (1899); *Benton v. State*, 30 Ark. 328 (1875). In *Fitzgerald*, our supreme court stated that a jury's view of the premises was "evidence to be considered by the jury in connection with other facts in the case." *Fitzgerald*, 67 Ark. at 265, 54 S.W. at 343. However, in more recent cases, particularly those involving bench trials, the supreme court has retreated from its position that a fact-finder's view may serve as evidence and has restricted such views to their usefulness as an aid for better understanding testimony that is already on record. *Johnson v. State*, 337 Ark. 196, 205, 987 S.W.2d 694, 699 (1999); *Potter v. Bryan Funeral Home*, 307 Ark. 142, 146, 817 S.W.2d 882, 884 (1991); *Mitcham v. Temple*, 215 Ark. 850, 851, 223 S.W.2d 817, 818 (1949). As a result, our courts now recognize that, when a judge's view exceeds that limited purpose, the judge commits error. *Potter*, 307 Ark. at 146, 817 S.W.2d at 884.

■ The question before us is whether the circuit judge's visit to appellant's home was undertaken for the purpose of understanding the proof that was already on record, which would be permissible, or whether, as characterized by appellant, the judge's inspection was an "evidence gathering foray," which would not be permissible. We conclude that the judge's view exceeded the scope allowed by our supreme court. The purpose of the court's visit was to acquire new evidence regarding the current state of appellant's home rather than to afford clarification or understanding of previously received testimony. While we understand the court's desire to bridge the gap in the photographic evidence by making a quick visit to appellant's home, we think that the better practice would have been for the court to dispatch the attorneys, parties, and a witness to observe appellant's apartment, then have the witness report back to the court on the record with a description of what was seen. Instead, by undertaking a personal view of the premises, the court added to the quantum of proof, which was contrary to law. The presence of error, however, does not end our inquiry.

■ Appellee correctly notes that appellant did not object to the court's on-site inspection of her home. Appellant responds that Ark. R. Evid. 605, which prohibits a trial judge from acting as a witness in a case, does not require an objection to preserve a claim of error. *See Lillie v. United States*, 953 F.2d 1188 (10th Cir.1992), and the cases cited therein (holding that Fed.R.Evid. 605, which is identical to Arkansas's rule, applies to a judge's view of a location and considers the view to be evidence in the form of the judge's own testimony). We need not address the applicability of Ark. R. Evid. 605 and its plain-error rule to the present situation, however, because any error committed by the court in visiting appellant's home was harmless based on the remaining proof adduced at the hearing.

■ We note first that appellant's own testimony corresponded to most, if not all, of the court's observations of her home. She testified that her house was "a mess" on the date of the hearing, that it was inappropriate for J.K. to return to, and that in some respects it was worse than when the previous pictures were taken in

April 2009. Where evidence is improperly admitted but the same evidence is admitted through another source, there is no reversible error. *See Suggs v. State,* 322 Ark. 40, 44, 907 S.W.2d 124, 126 (1995) (involving hearsay testimony).

Secondly, the record contains proof, separate and apart from the judge's personal view, that overwhelmingly supports the termination decision. Almost two years into the case, appellant had not maintained transportation as ordered; she was uncooperative with DHS; she was discharged from counseling for being noncompliant with her therapy and doctor's appointments; and she did not progress far enough in her own counseling to participate in family therapy. Moreover, evidence existed that she was cruel and inappropriate during her visits with J.K. and that she suffered from extreme paranoia and delusions as shown by her testimony at the hearing. Given the court's reliance on appellant's mental-health problems as the primary basis for termination, we cannot say, in our de novo review, that the court clearly erred in terminating appellant's parental rights. *Henson v. Ark. Dep't of Human Servs.,* 2009 Ark. App. 697, at 5, 2009 WL 3381815 (applying de novo review and the clearly-erroneous standard). *See also Potter,* 307 Ark. at 146, 817 S.W.2d at 884–85 (affirming the trial court based on other evidence in the case, despite the court's error in gathering evidence outside the courtroom). We therefore affirm the termination order.

Affirmed.

ROBBINS and MARSHALL, JJ., agree.